## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PATRICK K. BACA,

        Plaintiffs,

v.                                                      No. CIV-02-1002   JB/ACT

DAVID SKLAR and the
BOARD OF REGENTS OF THE
UNIVERSITY OF NEW MEXICO, ,

        Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment, filed May 12, 2003 (Doc. 60).  The primary issues are: (i) whether the Defendants discharged the Plaintiff; (ii) whether the Plaintiff has shown a genuine issue of material fact on a prima facie case of discrimination; and (iii) whether Plaintiff has shown a genuine issue of material fact that Defendants retaliated against him for exercising his First Amendment right to free speech.  Because the Court finds that the Plaintiff was not discharged, and that no genuine issue of material fact exists on either Plaintiff's discrimination or retaliation claims, the Court will grant the motion with respect to Plaintiff's federal claims.

### FACTUAL BACKGROUND

The Plaintiff, Patrick Baca ("Baca"), filed this lawsuit in the Second Judicial District, Bernalillo County, State of New Mexico.  See Notice of Removal to the United States District Court for the District of New Mexico at 1, filed August 13, 2002 (Doc. 1).  The Defendants removed the case to federal court.  See id.  Baca brought seven claims against the Defendants.  Counts I - IV are for discrimination under 42 U.S.C. § 1981, § 1983, Title VII, and the New Mexico Human Rights

Act, respectively. Count V is for aiding and abetting under the New Mexico Human Rights Act; Count VI is for First Amendment retaliation under § 1983 and Count VII is for Retaliatory Discharge. At the hearing on this matter, Baca clarified that Count VII is a state law claim.

**1.      Facts Relevant to Counts I, II, III, and IV.**

The Center of Injury Prevention Research and Education ("CIPRE") hired Baca as Program Manager effective March 5, 2001.  See Affidavit of Barbara Konrath ¶ 2, at 1 (executed May 9, 2003).  CIPRE is a subdivision of the School of Medicine's Department of Emergency Medicine ("Department").  See Deposition of David Sklar, M.D. at 5-6 (taken March 27, 2003).  Defendant David Sklar chairs the Department.  Sklar was one of CIPRE's founders.  See Skar Depo. at 9.

In addition to Sklar, Department Administrator Barbara Konrath, and many work study students, CIPRE had five full time employees at the time it hired Baca: Lynn Fullerton-Gleason, Ann Worthington, Norma Faries, Jonathon LaValley, and Jamie Michael.  See Konrath Aff. ¶ 3, at 1. Fullerton-Gleason, LaValley, and Worthington were researchers. Michael was a new program coordinator.  Faries was the secretary.

During the course of Baca's employment, Sklar received complaints about Michael from Baca and about Baca from Michael.  See Sklar Depo. at 52-54.[1]  Michael resigned from her position with CIPRE effective September 30, 2001.  See Konrath Aff. ¶ 4, at 2.  Michael left her position to follow

---

[1] Baca objects to the statements about complaints that Sklar received as inadmissible hearsay, admitting only, at times, that Baca talked to the complainant.  Statements constitute inadmissible hearsay when they are offered for their truth, see Fed. R. Evid. 801(c); statements offered not to show the truth of their content, but, rather, to establish the statements' effect on the listener do not, by definition, constitute hearsay.  The Court finds that the Defendants are not offering the statements, regarding complaints made to Sklar about Baca's behavior, to which Baca objects, for their truth in establishing Baca's behavior.  Rather, the Defendants offer these statements to establish their effect on Sklar and his resulting perception of Baca as Baca's supervisor.  The Court will consider these statements for this limited purpose only.

Department of Health ("DOH") funding. <u>See</u> Deposition of Jamie Michael at 22, 44-45 (taken March 31, 2003). Consequently, Baca promoted Faries into the program coordinator position and hired Roseann Jaramillo as the new secretary. Later, Kirsten Shelstad replaced Faires as program coordinator when Faires resigned to take a better-paying job. <u>See</u> Depostion of Jonathon LaValley at 14-16, 17-19.

Lynn Fullerton complained to Sklar on several occasions about the way that Baca treated her and about her concerns regarding his effect on CIPRE. <u>See</u> Sklar Depo. at 56. Effective October 1, 2001, Sklar transferred Fullerton, at her request, out of CIPRE and from under Baca's supervision. <u>See</u> Konrath Aff. ¶ 5, at 2. Fullerton accepted a job with another university, but continued to work part-time on her CIPRE project at UNM. <u>See</u> LaValley Depo. at 29-30. Sklar permitted Fullerton to change the departmental affiliation for her CIPRE project, removing Baca's supervisory authority over her, but her office location did not change.

Norma Faries expressed concern about Baca's management style and treatment of her. <u>See</u> Sklar Depo. at 56-57; 60-62; 107. Faries resigned from her employment with CIPRE effective on August 29, 2002 to take a higher paying job. <u>See</u> Konrath Aff. ¶ 6, at 2; LaValley Depo. at 14, 18. Shelstad replaced Faries and did not stay long; Ray Lewis replaced Shelstad. LaValley Depo. at 218-19. These events took place after Baca had resigned, which was effective August 12, 2002. <u>See</u> Separation Agreement.

Ann Worthington complained to Sklar that Baca was abusive and aggressive in his treatment of her, at least in part because she was a woman. <u>See</u> Sklar Depo. at 210. Worthington was released from CIPRE effective May 31, 2001. <u>See</u> Konrath Aff. ¶ 7 at 2. Worthington's project had ended and all funding spent before Baca began work with CIPRE; once Worthington caught up with her

work, she was released.  See Baca Depo. (Vol. I) at 63; id. (Vol. II) at 52.

During the course of Baca's employment, employees from DOH complained that Baca was arrogant and intimidating in his dealings with them, expressed concerns about being able to work with him or CIPRE in the future, and had made derogatory comments about Native American Indians. See Sklar Depo. at 88-91.     Jonathon LaValley also expressed concerns to Sklar about Baca's management style.  See Sklar Depo. at 56-57.

Theresa Ramos convened a mediation on February 12, 2002 to determine Baca's future with the Department.  See Sklar Depo. at 124; 128-134.  Jonathan Armendariz, in Dispute Resolution, and Vice Dean John Trotter were present at the mediation.  See id.  Baca did not have an attorney present at the mediation.  See Baca Depo. (Vol. II) at 92-94; Sklar Depo. at 157.  At the time of this meeting, Trotter was unaware of Baca's retaliation complaint.  See Deposition of John Trotter at 47-52.

Sklar believed that there was just cause for terminating Baca because of claims that Baca had sexually harassed others and because of Baca's unsatisfactory work performance in that he had alienated DOH, had done a poor job of preparing a proposal for a grant, had made disparaging remarks about his work and domestic violence, alienated the physicians who worked with CIPRE, had exhibited unprofessional behavior in the preparation of a vacancy announcement, and had intimidated a Native American student employee of CIPRE.  See Sklar Depo. at 161-164.

Based on allegations that Baca had sexually harassed other employees at CIPRE, Sklar initiated an inquiry with the  Office of Equal Opportunity ("OEO").  The OEO found that there was no cause to pursue such allegations.  See Regents' Answer to Interrogatory 16; Sklar Depo. at 113. None of the alleged victims of harassment filed OEO complaints.  Sklar told Human Resources he was going to pursue separating Baca from his job even if the OEO complaint was unfounded.  See

Deposition of Armijo at 157-160.

On August 30, 2001, Sklar sent Baca a letter of reprimand concerning a vacancy announcement that Baca posted.  See Sklar Memorandum to Baca, dated August 30, 2001.  In the vacancy announcement, Baca had stated: "Must play a positive role in an often multidisciplinary and ego-ridden environment."  Id.  Baca also indicated that the announcement sought applicants from a "non-ideological perspective."  Id.  Sklar's Memorandum informed Baca that these statements were offensive and inappropriate for use in a vacancy announcement.  Id.  Sklar further noted: "This notice serves as a written warning concerning your behavior . . . .  Should there be further unprofessional behavior, your position at the Center will be in jeopardy."  Id.

The announcement had gone through all the proper channels when Sklar objected.  See Armijo Depo. at 125; 140-41; 175.  Sklar did not consult the medical school's Human Resources on the disciplinary letter, who never saw it at the time, and did not know about it until later.  See id. at 100, 174-75.  The reprimand failed to comply with University requirements.  See id. at 92-100.

Sklar believed Baca's management style to be terrible and unsatisfactory in that he "essentially chased away almost everybody who worked at CIPRE."  Sklar Depo. at 213:4-21.  Baca maintains that staffing at CIPRE was "fluid" before he arrived.  See Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment at 4, filed May 29, 2003 (Doc. 68)("Response")(citing Sklar Depo. at 10-12).  Further, Baca notes that one position at CIPRE was lost when Sklar "took away a new part-time research position for which Mr. Baca had procured authorization."  Response at 5.

The result of the mediation held February 12, 2002 was a signed agreement whereby Baca agreed to resign effective August 12, 2002; that he would continue to work until August 12, 2002

at his home; and that he would have no further management responsibilities at CIPRE.  <u>See</u> Separation Agreement; Sklar Depo. at 155-156.  Baca told everyone present that he was signing the agreement under pressure and felt coerced to do so.  <u>See</u> Baca Depo. (Vol. I) at 104.

After Baca's resignation as program manager at CIPRE, the position was not filled, not advertised, and does not exist at this time.  <u>See</u> Sklar Depo. at 209-210.  There is some dispute whether CIPRE still exists -- the name still exists and the concept still exists, but the structure has been dissolved and there is no program manager.  <u>See</u>  Sklar Depo. at 199.

Baca was the only Hispanic Program Manager within the Department.  <u>See</u> Admission 1; Regents' First Supplemental Answer to Interrogatory 4.  There was only one other Hispanic Program Manager in the medical school.  <u>See</u> Regents' Answer to Interrogatory 5; First Supplemental Answer to Interrogatory 5.  Of the twenty deans, vice dean and associate deans who run the medical school, only one or two associate deans are Hispanic.  <u>See</u> Admission 2.

  **2. Facts related to Counts V, VI, and VII.**

During the first week of April, 2001, Baca attended a lunch meeting with Jamie Michael, a CIPRE employee, and Karen Gaylord, an employee from DOH.  Michael invited Baca to the lunch telling him Gaylord had money for them.  <u>See</u> Baca Depo. (Vol. I) at 86-87; 89; 92.  At the lunch, Gaylord told Baca that DOH had between $60,000 and $80,000, and that she wanted it to go to three places: to Robert Lucero, the head of New Mexico Advocates for Families and Children ("Advocates"), some to CIPRE for indirect costs, and the rest to Debra Helitzer.  <u>See id.</u> at 93-94.  Debra Helitzer was a UNM physician not within the Department who was, at the time, dating Sklar.  Gaylord did not say where the money was coming from; what Robert Lucero was to do in consideration of receiving it; or how much was to go to Lucero.  <u>See id.</u> at 94:2-4; 94:16-95:1.

Gaylord also did not tell Baca what Helitzer was supposed to do in consideration for the funds.  See id. at 95; 97-98.  Baca's understanding was that Robert Lucero had worked for DOH within the past year and that Lucero had established Advocates after he retired from DOH.  See id. at 96-97; 102).

At the end of the lunch, Baca told Gaylord that he did not think the proposal was a good idea and that he thought she should give the money to the named individuals and entities in a more direct manner.  In response, Gaylord grimaced her face and told him that the CIPRE already had a similar contract in place which funded half of Michael's salary with the rest going directly to Lucero's organization.  See Baca Depo. (Vol. I) at 103-104.

Baca investigated and found what Gaylord had told him to be true.  He found that Michael had been pre-selected for her position and hired at a pay rate that Baca felt far exceeded her experience level.  See id. at 114.  DOH had expanded its grant to CIPRE through a contract amendment, and these funds were meant, in part, to pay Michael's salary.  The bulk of the money given to CIPRE in this DOH contract amendment was a flow through to Lucero's non-profit organization, Advocates.

Grants from one state entity to another are exempt from the requirements of the New Mexico Procurement Code.  See e.g. NMSA 1978, § 13-1-98(A).  Grants from a state agency to a private entity are not exempt and are subject to the Code's requirements.  See NMSA 1978, § 13-1-30(A). The contract amendment process DOH used with CIPRE avoided issuing a competitive Request for Proposal (RFP) by giving the money to CIPRE with the proviso that the money be passed along to Lucero's organization.

Baca learned that Michael's job had never been posted for applications.  See Baca Depo. (Vol. I) at 114, 119-120; Deposition of Rob Armijo at 124.  Instead, CIPRE submitted paperwork

for signature by the Dean of the medical school authorizing Michael for hire via appointment, on the grounds that she had been named in CIPRE's grant with the State Highway Department Traffic Safety Bureau and that Advocates had requested her to serve. <u>See</u> Appointment Authorization for Jamie Michael. The State Highway Department, however, had not asked for Michael to work on its grant. <u>See</u> Admissions 15 and 17. Advocates also had never requested Michael. <u>See</u> Admission 16.

Baca consulted with University Human Resources and Dispute Resolution about separating Michael from her job while she was still a probationary employee. When he explained information he had discovered concerning Michael's hiring process, he was referred to Internal Audit and University attorney Liz Staley. <u>See</u> Baca Depo. (Vol. II) at 195. When Baca showed the DOH contract amendment to Staley, she uttered a few curse words and shared with Baca that she had previously worked for DOH and knew about its past misbehavior in procurement. <u>See</u> Baca Depo. (Vol. I) at 129-33; Staley Depo. at 54-55 (admitting Gaylord was one of her past clients).[2] Sklar refused to terminate Michael's employment, despite admitting that the reports about her work ethic were "problematic." <u>See</u> Sklar Depo. at 205-207.

Baca took his concerns regarding Gaylord's offer to Sklar, Konrath, Human Resources, Dispute Resolution, university counsel, OEO and internal audit. <u>See id.</u> at 127. Although Baca had discussed other aspects of the same contract with the University Controller, he did not go back and ask the controller to look into the aspect that he thought was unlawful or illegal. <u>See id.</u> at 104-105. When Baca reported Gaylord's offer to Sklar, Sklar responded by stating "we can't do that" and declining to discuss the matter further. <u>See id.</u> at 120-122. Within a month, Baca raised the subject

_____

[2] DOH had been sued during Staley's tenure there when it tried to cut off a four-year contract with one of its service providers prematurely.

again with both Sklar and Konrath; Konrath did not seem surprised and thought it a bad idea while Sklar did not say anything at all.  See id. at 123-125.

In June, Baca raised his concern with Jonathon Armendariz in Dispute Resolution while discussing problems with his staff.  See id. at 128-129.  Baca characterizes this meeting with Armendariz as taking place "when he began to experience retaliation."  Response ¶ 32, at 8. Armendariz referred Baca to Staley.  Baca met and discussed the matter with Staley in July 2001. According to Baca, after a long discussion, they decided to let the current contract with DOH "run out," and Staley told Baca not to enter any more contracts of that nature.  See id. at 127; 129-133. Baca discussed his problems supervising Michael with Staley, and Staley agreed that Michael's employment should be terminated while she was still on probation.  Sklar refused.  See Baca Depo. (Vol. 11) at 60.

In January 2002, Baca met with Theresa Ramos, acting director of OEO, and told her of his concerns about the offer made at the lunch in April 2001 and the contract with DOH.  According to Baca, Ramos referred him to Susan Mullins, the director of UNM Internal Audit.  See Baca Depo. at 19-21.  Baca met with Mullins in February 2002, and after discussing the matter, Mullins stated that they were "going to look into it."  Id. at 19; 21-22.  It appears the investigation either did not take place or was not conclusive.  Internal Audit Director Susan Mullins confirmed: "There was no written closure of that complaint."  Deposition of Susan Mullins at 79.

In February 2002, Baca filed a written report with OEO and Internal Audit reporting his concerns with Michael's contract as well as his belief that he was experiencing retaliation for reporting his concerns and his perception that Anglo supervisors were not treated this way.  See Baca's written report, Exhibit 4 to Motion to Enforce.  Baca's complaint was rejected.  See OEO

letter declining to investigate Baca's complaint.

Baca asserts that, within a week of raising the issues regarding the Department's financing with Sklar, Baca found his supervisory authority undermined. See Baca Depo. (Vol. II) at 25, 29-30. When Baca successfully obtained approval for a new partial research position for CIPRE, and hired a researcher for the job, Sklar assigned the new researcher to a different supervisor. See id. at 55-56.

## STANDARDS FOR DECIDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure allows a court to grant summary judgment if a party is entitled to judgment as a matter of law and there are no genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  To avoid summary judgment, the non-moving party must contradict facts that the movant specifically avers.  See Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).  The court must deny a motion for summary judgment when a genuine issue of material fact remains to be tried, or where the moving party is not entitled to a judgment as a matter of law.  See Kennedy v. Silas Mason Co., 334 U.S. 249, 252 (1948).

The moving party bears the initial burden of establishing the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. at 323.  The moving party can meet this burden by "pointing out to the court a lack of evidence as to an essential element of the non-movant's claim. The burden then shifts to the non-movant to present specific facts, admissible at trial, from which a rational trier of fact could find for the non-movant."  Bewley v. City of Duncan, 149 F.3d 1190 (table), 1998 WL 314382, *4 (10th Cir. 1998)(citing Fed. R. Civ.  P. 56(c); Celotex Corp. v. Catrett, 477 U.S. at 324).  The non-moving party may not rest on his pleadings but must set forth specific facts.  See Applied Genetics Int'l v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Under rule 56(e), only statements made with actual knowledge will support a motion for summary

judgment; the court must disregard statements of mere belief.  See Tavery v. United States, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)(citations omitted).

For the purposes of summary judgment, the court will assume the evidence of the non-moving party to be true, will resolve all doubts against the moving party, construe all evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in the non-moving party's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  If "the evidence, interpreted favorably to the plaintiff, could persuade a reasonable jury that the employer had discriminated against the plaintiff," the court should deny summary judgment.  MacDonald v. Eastern Wyoming Mental Health Ctr., 941 F.2d 1115, 1121 (10th Cir. 1991).

The court should, however, grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  A "genuine" factual dispute requires the non-moving party to show more than a mere scintilla of evidence to overcome a motion for summary judgment.  Id. at 252.

The court may grant summary judgment if the non-moving party's evidence is merely colorable or is not significantly probative.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rest on ignorance of the facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether

it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc.,

477 U.S. at 251-52.

## DISCUSSION

**I.    THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNTS I, II AND III, PLAINTIFF'S DISCRIMINATION CLAIMS.**

### A.    DIRECT EVIDENCE

A plaintiff in an employment discrimination case can prove discrimination by direct evidence

such as proof of "an existing policy which itself constitutes discrimination . . . ," Ramsey v. City and

County of Denver, 907 F.2d 1004, 1008 (10th Cir. 1990), cert. denied, 506 U.S. 907 (1992), or

statements or comments which are discriminatory on their face,  Perry v Woodward, 199 F.3d 1126,

1134 (10th Cir. 1999), cert. denied 529 U.S. 110 (2000).   There is no direct evidence of

discrimination in this case.

### B.    THE McDONNELL DOUGLAS BURDEN-SHIFTING FRAMEWORK

In the absence of direct evidence, claims of age, race, national origin, gender discrimination,

and retaliation are all subject to the Supreme Court's burden-shifting framework established in

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973).  See Pastran v. K-Mart Corp.,

210 F.3d 1201, 1205 (10th Cir. 2000)(noting that retaliation claims are subject to the burden-shifting

analysis under McDonnell Douglas); Munoz v. St. Mary-Corwin Hospital, 221 F.3d 1160, 1165-67

(10th Cir. 2000)(holding that court must analyze claims of age discrimination under the ADEA and

discrimination under Title VII under the analysis that the Supreme Court established in McDonnell

Douglas).   A plaintiff may establish a prima facie case of wrongful termination by showing that: (i)

he belongs to a protected class; (ii) he was qualified for the job; (iii) despite his qualifications, he was

discharged; and (iv) the job remained open and was filled after his discharge.  Perry v. Woodward, 199 F.3d at 1135; Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1171, 1174-75 (10th Cir. 1996). A plaintiff satisfies the fourth prong by showing that the employer had a continued need for someone to perform the same work after the plaintiff left.  See Perry v. Woodward, 199 F.3d at 1139 (citing Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 155 (1st Cir. 1990)).

Under McDonnell Douglas, the establishment of a prima facie case of discrimination creates a presumption that the employer unlawfully discriminated or retaliated against the employee.  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).  This presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case.  See id. at 506-507. This burden is one of production, not persuasion.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

To meet its burden, the defendant need only articulate a facially nondiscriminatory reason for its actions.  The defendant is not obligated to litigate the merits of its reasoning nor does it need to prove that the reasons it relied upon were bona fide.  See Panis v. Mission Hills Bank, N.A., 60 F.3d 1486, 1491 (10th Cir. 1995), cert. denied, 516 U.S. 1160 (1996); EEOC v. Flasher Co., 986 F.2d 1312, 1316 (10th Cir. 1992).  Once the defendant has met its burden, the presumption of unlawful discrimination drops from the case.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 506.

After the defendant has met its burden of producing an explanation, the plaintiff bears the ultimate burden of persuading the trier of fact that the defendant unlawfully discriminated or retaliated against him.  The plaintiff discharges that burden directly by proving that the defendant acted with discriminatory motive or indirectly by showing that the stated reason for its action was a pretext, i.e., the facially nondiscriminatory reason was a cover-up for a decision motivated by unlawful

-13-

discrimination.  See EEOC v. Flasher Co., 986 F.2d at 1316.  "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and thence infer that the employer did not act for the asserted non-discriminatory reasons."  Morgan v. Hilti, 108 F.3d 1319, 1323 (10th Cir. 1997)(citing Olson v. General Electric Astrospace, 101 F.3d 947, 951-52 (3d Cir. 1996)).

Although McDonnell Douglas involved a Title VII claim, the analytical framework it pioneered applies equally to discrimination claims brought under §§ 1981 and 1983.  See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225-6 (10th Cir. 2000); Perry v. Woodward, 199 F.3d at 1135, 1141.[3]

**C.    BACA'S PRIMA FACIE CASE**

The Defendants argue that Baca cannot meet either the third or fourth prongs of this analysis. Specifically, the Defendants note that Baca resigned in February 2002 in a Separation Agreement, effective August 12, 2002.  The Defendants did not, therefore, discharge Baca.  Baca argues that he was constructively discharged and, therefore, meets the third prong of his prima facie case.

---

[3] Although the courts recognize concurrent application of Title VII and 42 U.S.C. §§ 1981 and 1983, the plaintiff must have an independent basis for the claims outside of Title VII, "lest Congress' prescribed remedies under Title VII be undermined."  Drake v. City of Fort Collins, 927 F.2d 1156, 1162 (10th Cir. 1991)(citing Starrett v. Wadley, 876 F.2d 808, 813-14 (10th Cir. 1989). Where a plaintiff has alleged due process and equal protection rights violations under §§ 1981 and 1983, the court has found an independent basis for those claims.  In this case, however, Baca alleges discrimination based on ethnicity or national origin under the §§ 1981 and 1983 claims as well as the Title VII claim.  There is, thus, no independent basis for Baca's §§ 1981 and 1983 claims outside his Title VII claims, and Title VII precludes his §§ 1981 and 1983 claims .  The Court is dismissing Baca's federal discrimination claims because he has failed to meet his prima facie burden.  Even if the Court were to find that Baca can meet his burden under Title VII, however, it would be appropriate to dismiss Baca's §§ 1981 and 1983 claims.

A constructive discharge occurs when an employer, through its illegal discriminatory acts, makes working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.  See Sanchez v. Denver Pub. Sch., 164 F.3d 527, 533 (10th Cir. 1998); Derr v. Gulf Oil Corp., 796 F.2d 340, 344 (10th Cir. 1986).  "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged."  Jeffries v. State of Kansas, 147 F.3d 1220, 1233 (10th Cir. 1998).  To establish a claim of constructive discharge, the plaintiff must essentially show that he had no choice other than resignation.  See Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1221 (10th Cir. 2002)("The bar is quite high in such cases: a plaintiff must show he had no other choice but to quit."); Yearous v. Niobara County Mem'l Hosp., 128 F.3d 1351, 1356 (10th Cir. 1997)("Constructive discharge occurs when a reasonable person in the employee's position would view the working conditions as intolerable. That is to say the working conditions, when viewed objectively, must be so difficult that a reasonable person would feel compelled to resign."); Schaulis v. CTB/McGraw-Hill, Inc., 496 F. Supp. 666, 676 (N.D. Cal. 1980)("An employer has not effected a constructive discharge merely because an employee believes that she has lost respect or credibility within the company or that she has limited opportunities for advancement.") .  In other words, the employment conditions must be objectively intolerable.  See Sanchez v. Denver Pub. Sch., 164 F.3d at 533.

The plaintiff's subjective views of the situation are irrelevant.  See id.  In addition, a majority of the Circuits, including the Tenth, require that the alleged acts of discrimination be accompanied by aggravating circumstances, i.e., the plaintiff must make a showing of something more than garden-variety acts of discrimination.  See James v. Sears Roebuck & Co., 21 F.3d 989, 992 (10th Cir. 1994)(holding that a court must not base a finding of constructive discharge only on the

discriminatory act and that there must also be aggravating factors that make staying on the job intolerable); Irving v. Dubuque Packing Co., 689 F.2d 170, 172 (10th Cir. 1982).

Moreover, in cases involving alleged constructive discharge, the general rule is that a reasonable employee must remain and fight discrimination on the job. In fact, there is a presumption that, unless the situation becomes intolerable, it is preferable for the employee to seek redress within the context of the employment relationship. See Derr v. Gulf Oil Co., 796 F.2d 340, 342-43 (10th Cir. 1986)("We agree with the Fifth Circuit's statement in Bourque [v. Powell Elec. Mfg. Co., 617 F.2d 61, 66 (5th Cir. 1980)] that 'society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships.'"); Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997)("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress."); Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987) (holding that employee has duty to inform higher management and use available grievance procedures, including the EEOC). The obligation to seek redress is particularly true given the statutory protections from discrimination and retaliation that Title VII and other statutes afford. See Derr v. Gulf Oil Corp., 796 F.2d at 344 (10th Cir. 1996); Bourque v. Powell Elec. Mfg. Co., 617 F.2d at 66.

Baca has not presented evidence that would meet this heavy burden to establish constructive discharge. He cannot meet the third prong of his prima facie case. The record does not present a genuine issue of material fact on this element that the Court needs to submit to a jury.

Even if the Court were to assume he meets the third prong, Baca also failed provide evidence and create a genuine issue of material fact on the fourth prong of the prima facie case: that his job

remained open and was filled after his discharge.  The record before the Court establishes that the Defendants have not hired a replacement program manager and, at least to date, do not foresee doing so.  It is true that, to some extent, the elements under <u>McDonnell Dougless</u> are flexible.  <u>See</u> <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).  The Tenth Circuit, however, has stated the four elements presented above as those used to establish a case for wrongful discharge, and Baca has not persuaded the Court, a district court, may or should depart from them.

Baca has not established a genuine issue of fact as to either the third or fourth elements of his prima facie case, and, therefore, has not established an issue of fact on his discrimination claims.

**D.    PRETEXT**

Even if this Court were to determine that the prima facie elements could be interpreted so broadly that Baca has established some issue of fact on each element, the Court must look to whether the Defendants have offered legitimate non-discriminatory reasons for their actions and whether Baca has presented evidence that such reasons are pretextual.

Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment.  <u>See</u> <u>Richmond v. ONEOK, I</u>nc., 120 F.3d at 209; <u>Pastran</u>, 210 F.3d at 1206.  A plaintiff withstands a motion for summary judgment and is entitled to a trial if she presents evidence that the defendant's proffered reason is unworthy of belief.  <u>See</u> <u>Kendrick</u>, 220 F.3d at 1230; <u>Randle v. City of Aurora</u>, 69 F.3d 441, 451 (10th cir. 1995).

When assessing a contention of pretext, the Court must examine the facts "as they appear to the person making the decision to [take the adverse action against the] plaintiff."  <u>Kendrick v. Penske Transp. Servs. Inc.</u>, 220 F.3d at 1231. <u>See</u> <u>Shorter v. ICG Holdings, Inc.</u>, 188 F.3d 1204, 1209 (10th Cir. 1999)(noting that it is the manager's perception of the employee's performance, and not the

-17-

employee's subjective evaluation of her performance, that is relevant in determining pretext).  The Court may not second guess the employer's business judgment.  See Selenke v. Medical Imaging of Colo., 248 F.3d 1249, 1260-61 (10th Cir. 2001) (affirming entry of summary judgment for employer and finding that proffered reason for termination was not pretext for disability discrimination); Simms v. Oklahoma ex rel. Dept. of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir.)(noting that the court's role is to "prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments"), cert. denied, 528 U.S. 815 (1999); Martinez v. Henderson, 2002 WL 32065672, *15 (D.N.M. 2002)(Smith, M.J.)(same proposition; granting summary judgment to employer).

Setting aside whether the allegations against Baca were actually well-founded, the Court must consider the information that Baca's employers had at the time they negotiated his Separation Agreement.  The evidence before the Court is that the Defendants had legitimate, non-discriminatory reasons for the actions they took with regard to Baca.

Baca argues that the Defendants selectively enforced the Department's rules and/or procedures and that this selective enforcement establishes pretext.  It is true that evidence of selective enforcement of an employer's rules or procedures may provide evidence of pretext.  See Spulak v. K-Mart Corp., 894 F.2d 1150, 115 (10th Cir. 1990)( "A plaintiff may counter proof of legitimate business reasons by showing that the rules were not uniformly enforced.").  Baca's evidence of selective enforcement is that: (i) Sklar has never similarly disciplined another employee; (ii) Sklar has never referred another employee to OEO; (iii) the mediation process in February 2002 was "unprecedented"; and (iv) no Anglo supervisor has been treated this way.  Response at 26.  Baca presents no evidence, however, that any other supervisor or employee engaged in similar behavior

-18-

that may have warranted the discipline Sklar imposed or the mediation process.  To establish that the Defendants selectively enforced their policies or rules, Baca needs to point to a situation where another supervisor or employee in similar circumstances was treated differently.  Baca has not done so and has not, therefore, created a genuine issue of fact on pretext.

The Court will, therefore, grant summary judgment to the Defendants on Baca's discrimination claims under federal law in Counts I, II and III of his Complaint.

## II.   BACA'S DISPARATE IMPACT CLAIMS MUST FAIL.

While Baca's Complaint does not, on its face raise a disparate impact claim, his Response sets forth facts including statistical evidence that might support such a claim.  At the hearing on this motion, Baca indicated that he is pursuing a disparate impact theory.  Setting aside the issue whether such a claim is proper at this late stage, the Court finds that, even if it were to allow Baca to amend his complaint and include the claim, Baca has not provided satisfactory evidence in support of a disparate impact theory.

Statistical evidence must cross a threshold of reliability before it can establish a prima facie case of disparate impact.  See Martinez v. Wyoming Dep't of Family Servs., 218 F.3d 1133, 1138 (10th Cir. 2000).  Statistical evidence must compare similarly situated individuals, and it must be drawn from an adequate sample size.  See Mayor of Philadelphia v. Educational Equality League, 415 U.S. 605, 620 (1974)(finding that a 13 member panel was too small a sample to use in making comparisons).  Where special qualifications are necessary, the relevant statistical pool for purposes of showing discrimination must be the number of the minority qualified to undertake the particular task.  See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 501 (1989).  Further, statistical evidence must compare similarly situated individuals and must properly eliminate nondiscriminatory

reasons for any numerical disparities.  See Martinez v. Wyoming Dep't of Family Servs., 218 F.3d at 1138-39 (citing Rea v. Martin Marietta Corp., 29 F.3d 1450, 1456 (10th Cir. 1994)).

Baca states that he was the only Hispanic Program Manager within the Department. However, there were only two program managers in the Department.  See Baca Depo. (Vol I) at 51. This leads to two conclusions: (i) Hispanics were represented in 50% of the available positions, and (ii) this was too small a sample to use in making comparisons.  See Mayor of Philadelphia v. Educational Equality League, 415 U.S. at 620.

Baca provided other statistics.  He states that he was the only Hispanic Program Manager in the medical school, but does not provide evidence of how large the sample he uses is and does not take into account nondiscriminatory reasons for any numerical disparities.  See Martinez v. Wyoming Dep't of Family Servs., 218 F.3d at 1139.  Baca also relies upon a chart which compares the number of Hispanic residents in Bernalillo County with the number of Hispanics in administrative jobs at the School of Medicine.  He does not, however, compare the number of Hispanics in administrative jobs at the School of Medicine with the number of Hispanic residents in Bernalillo County who are qualified to work as administrators in the School of Medicine.

Because Baca did not comply with the Supreme Court's and the Tenth Circuit's guidance on proper statistical evidence supporting a disparate impact claim, and because he failed to allege such a claim in his Complaint, the Court will grant summary judgment on Baca's disparate impact claim.

## III.    THE COURT WILL GRANT SUMMARY JUDGMENT ON BACA'S FIRST AMENDMENT RETALIATION CLAIM IN COUNT VI.

The Tenth Circuit has adopted a multi-tier test to analyze whether a public employer's actions impermissibly infringe on an employee's free speech rights.  See Martin v. City of Del City, 179 F.3d

882, 886 (10th Cir. 1999) (citing <u>Schalk v. Gallemore</u>, 906 F.2d 491, 494 (10th Cir. 1990)).  First, the Court must decide whether the speech at issue touches on a matter of public concern.  <u>See</u> <u>Connick v. Meyers</u>, 461 U.S. 138, 146 (1983).  If it does, the Court must balance the interest of the employee in making the statement against the employer's interest "in promoting the efficiency of the public services it performs through its employees."  <u>Pickering v. Board of Educ.</u>, 391 U.S. 563, 568 (1968).  If the preceding prerequisites are met, the speech is protected, and the plaintiff must show his or her expression was a motivating factor in the detrimental employment decision.  <u>See</u> <u>Mount</u> <u>Healthy City School Dist. v. Doyle</u>, 429 U.S. 274, 287 (1977).  Finally, if the plaintiff sustains this burden, the employer can still prevail if it shows by a preponderance of the evidence that it would have made the same decision regardless of the protected speech.  <u>See</u> <u>id.</u>  The first two questions of the <u>Pickering</u> test are questions of law, while the latter two are questions of fact.  <u>See</u> <u>Aiken v. Rio</u> <u>Arriba Bd. of County Comm'rs</u>, 134 F. Supp. 2d 1216, 1219 (D.N.M. 2000)(Black, J.).

To determine whether speech touches on a matter of public concern, the Court must determine whether it can "be fairly considered as relating to any matter of political, social, or other concern to the community."  <u>Connick v. Meyers</u>, 461 U.S. at 146.  This examination requires analysis of the "content, form, and context of a given statement, as revealed by the whole record."  <u>Id.</u> at 147-48.  Courts have stated that, when the content of the speech focuses on disclosing public officials' malfeasance or wrongdoing, it is likely to be considered a matter of public concern.  <u>See</u> <u>Lighton v.</u> <u>University of Utah</u>, 209 F.3d 1213, 1224-25 (10th Cir. 2000);  <u>Wulf v. City of Wichita</u>, 883 F.2d 842, 857 (10th Cir.1989).  <u>See</u> <u>also</u> <u>Koch v. City of Hutchinson</u>, 847 F.2d 1436, 1445-46 & n.17 (10th Cir.)(en banc)("[M]any courts have particularly focused on the extent to which the content of the employee speech was calculated to disclose wrongdoing or inefficiency or other malfeasance on the

part of governmental officials in the conduct of their official duties.") cert. denied, 488 U.S. 909
(1988).

Conversely, speech is generally not protected if the aim is simply to air grievances of a purely
personal nature.  See id.  It is not sufficient that the topic of the speech be of general interest to the
public.  What is actually said must be of public concern.  See Wilson v. City of Littleton, 732 F.2d
765, 769 (10th Cir.1984).

Baca asserts that he engaged in four separate categories of protected speech: (i) his statements
regarding the procurements, grants and contracts with DOH; (ii) his statements regarding the hiring
of Jamie Michael; (iii) statements regarding discrimination against himself and others; and (iv)
statements alleging retaliation.

Taking the latter two categories of speech first, the Court does not believe that they meet the
requirements for matters of public concern.  The evidence is that Baca's statements about
discrimination and retaliation that he suffered were personally motivated and not designed to expose
wrongdoing or malfeasance.  The Court will assume, however, without deciding, that Baca's speech
regarding the Department's financial dealings involved allegations of financial wrongdoing and were
not personally motived, and thus involved a matter of public concern.

The second step of the Pickering test for First Amendment retaliation is to balance the
competing interests of the employee and the employer.

> Pickering directs us to consider a number of factors in balancing the competing
> interests at stake.  "[T]he manner, time, and place of the employee's expression are
> relevant, as is the context in which the dispute arose." . . . Pertinent considerations
> include "whether the statement impairs discipline by superiors or harmony among
> coworkers, has a detrimental impact on close working relationships for which
> personal loyalty and confidence are necessary, or impedes the performance of the
> speaker's duties or interferes with the regular operation of the enterprise."

Wulf v. City of Wichita, 883 F.2d 842, 861 (10th Cir. 1989)(quoting Rankin v. McPherson, 483 U.S. 378, 386-87 (1987)).  In this case, with regard to Baca's speech on a matter of public concern, Baca went to a variety of internal sources before filing a grievance.  The Court will assume, without deciding, that the manner, time and place of Baca's speech weigh in his favor with regard to the balancing test.

Assuming a plaintiff prevails on the first two factors of the Pickering test as a matter of law, the plaintiff must establish that his speech was a substantially motivating factor in the employer's decision.  The Court must look at the record and determine whether Baca has established a genuine issue of material fact whether his speech regarding the Department's financial dealings was a motivating factor in the Defendants' decisions about and actions against him.[4]

To the extent Baca's retaliation claims rest on his allegation that he was wrongfully discharged, the Court again notes that Baca has failed to establish that he was discharged.  Further, Baca's allegations that Sklar undermined his supervisory authority, that Sklar was disrespectful by interrupting, changing subjects, and not participating in discussions, and that Sklar stopped attending staff meetings on a regular basis do not describe actionable adverse actions.  See Belcher v. City of McAlester, Oklahoma, 324 F.3d at 1207 n.4 ("If the action taken by the employer in response to the employee's speech is inconsequential or has only speculative consequences, there can be no basis for

_____

[4] The Court notes that, to be actionable as First Amendment retaliation, the decisions about and actions against Baca must constitute "adverse actions."  See Belcher v. City of McAlester, Oklahoma, 324 F.3d 1203, 1207 n.4 (10th Cir. 2003)("Implicit in the Pickering test is a requirement that the public employer have taken some adverse employment action against the employee.  See Koch v. City of Hutchinson, 847 F.2d 1436, 1440 (10th Cir. 1988) (noting that Pickering and its progeny 'establish the basic framework for analyzing a claim by a public employee that his or her governmental employer made an adverse employment decision in violation of the employee;s First Amendment rights.' (emphasis added)). ").

-23-

a First Amendment claim."). Baca cannot, therefore, assert that the Defendants retaliated against him in these ways because the Defendants either did not take such actions (such as discharging him) or the allegations do not constitute actionable adverse actions.

Even assuming that Baca was discharged or that any other of Sklar's actions constituted actionable adverse actions, Baca has not presented evidence that these actions were causally related to his speech. Baca asserts that the temporal proximity of his speech and alleged retaliation supports a finding of causation. First of all, the record does not allow a reasonable inference of temporal proximity. Baca signed the Separation Agreement in February 2002, ten months after his April 2001 lunch with Gaylord and after subsequent conversations with Sklar about he Department's financial dealings. The timing, thus, does not give rise to a reasonable inference that Baca's speech was a substantially motivating factor in his separation from CIPRE. C.f. Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999)(noting that a one and one half month period by itself may establish causation, while a three month period may not); Duran v. State of New Mexico Dept. of Labor, 143 F. Supp. 2d 1278, 1284 (D.N.M.)(citing Richard v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997)(affirming district court holding that three-month period, standing alone, is insufficient to establish causation)), aff'd, 26 Fed. Appx. 880, 2002 WL 120527 (10th Cir. 2002)).

Second, in First Amendment retaliation cases temporal proximity alone is not sufficient to establish that protected speech was a substantially motivating factor in an employer's adverse employment decision. See Butler v. City of Prairie Village, Kansas, 172 F.3d 736, 746 (10th Cir. 1999)("Plaintiff has not established that the speech was a motivating factor in his termination. The mere temporal proximity of Plaintiff's protected speech to his termination is insufficient, without more, to establish retaliatory motive.")(citing Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th

Cir.), cert. denied, 518 U.S. 1019 (1996); Love v. Re/Max of Am., Inc., 738 F.2d 383, 386 (10th Cir.1984).  Baca suggests no more than temporal proximity to establish the causally related element. Baca has not, therefore, established a genuine issue of material fact that his speech substantially motivated the Defendants' decisions about and actions against him.

Baca also asserts retaliation on the basis of Sklar's August 2001 disciplinary memo to Baca regarding the vacancy announcement.  A letter of reprimand may constitute an adverse action in terms of actionable First Amendment retaliation.  See Belcher v. City of McAlester, Oklahoma, 324 F.3d at 1207 n.4 (finding that letter of reprimand constituted adverse action).  This memo, however, occurred four months after Baca's speech alleging wrongdoing by the Department -- the lunch with Gaylord, and Baca's subsequent conversation with Sklar occurred in early April 2001. Baca has presented no additional evidence that his speech and Sklar's memo were causally related.  He has, therefore, failed to create a genuine issue of fact whether his speech was a substantially motivating factor in Sklar's decision to reprimand him.

Baca has not presented evidence on the third factor of the Pickering test.  Even if the Court were to assume that he has met this factor, the evidence is that the Defendants would have followed the same course of conduct in the absence of Baca's speech.  As noted above, Sklar had legitimate, nondiscriminatory reasons for his actions in reprimanding Baca and in the role he played in Baca's separation from CIPRE.  Further, Baca has offered no evidence that the Defendants would have acted differently in the absence of his speech.

The Court finds that Baca has not met his burden under Pickering and has not established a genuine issue of material fact on his First Amendment retaliation claims.  The Court will grant summary judgment on Count VI.

**IV.     THE COURT WILL REMAND BACA'S STATE LAW CLAIMS.**

Baca's remaining claims in Counts IV, V and VII fall under New Mexico state law.  This Court has supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367.  The decision to exercise supplemental jurisdiction is within the Court's discretion.  See  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 351 (1988); Archuleta v. Lacuesta, 131 F.3d 1359, 1368 n.4 (10th Cir. 1997).  There are no remaining federal claims;  the Court will remand the remaining state law claims.

**WHEREFORE, IT IS ORDERED** that the Defendants' Motion for Summary Judgment is granted in part and Plaintiff's federal claims in Counts I, II, III, and VI of his Complaint are dismissed with prejudice. Judgment on the federal claims will be entered for the Defendants and against the Plaintiff on these counts.  The remaining state law claims in Counts IV, V and VII will be remanded to the Second Judicial District, Bernalillo County, State of New Mexico.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Kathryn A. Hammel
The Hammel Law Firm
Albuquerque, New Mexico

   *Attorney for Plaintiff Patrick J. Baca*

John M. Wells
Law Office of John M. Wells, P.A.
Albuquerque, New Mexico

   *Attorney for Defendants David Sklar and*
   *Board of Regents of the University of New Mexico*